ADAMS, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>     Plaintiff,         )<br>  )<br>v.                         )<br>  )<br>JAIME RUVALCABA,           )<br>  )<br>     Defendant.        )<br>  ) | CASE NO.   5:08CR379<br><br>Judge John R. Adams<br><br>SENTENCING MEMORANDUM |

**I.  Introduction**

This matter is before the Court for the sentencing of Defendant Jaime Ruvalcaba. On January 27, 2009, Ruvalcaba pled guilty to conspiracy to possess with intent to distribute cocaine. The Court ordered and received a pre-sentence investigation and report ("the Report") related to the charges herein. Ruvalcaba has objected to several aspects of the report. The Court sentenced Ruvalcaba in open court to 188 months incarceration for the reasons stated on the record and those contained herein.

**II.  Advisory Guideline Calculations**

The base offense level for Ruvalcaba's crime is 26. *See* U.S.S.G. § 2D1.1(c)(7). Upon the Government's recommendation, the Court granted a three level reduction for Ruvalcaba's acceptance of responsibility. The offense level under the advisory guidelines, therefore, is 23. Ruvalcaba's criminal history was then calculated, placing him in Category V. Based upon that classification, Ruvalcaba's advisory range would have been 84-105 months. The Report, however, concluded that Ruvalcaba was a career offender, increasing his history to a Category VI

and his offense level to 31 (34 minus the 3 for acceptance of responsibility).  Based upon this assessment, Ruvalcaba's advisory range would be 188-235 months.

### III.  Objections and Arguments

Ruvalcaba objected to the Report's conclusion that he was a career offender.  For the reasons that follow, the Court finds no merit in Ruvalcaba's objection.

> U.S.S.G. § 4B1.1(a) provides:
>
> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

In turn, U.S.S.G. § 4B1.2(a) defines "crime of violence" as

> any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
>
> (2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

It is undisputed that the only provision that could apply to Ruvalcaba is that his conduct presented a serious potential risk of injury to another.  The Court therefore reviews Ruvalcaba's contention under that prong.

Both of the prior offenses at issue involve Ruvalcaba's convictions for violating Ohio Revised Code (O.R.C.) § 2923.161(A)(1).  That provision provides as follows:

> (A) No person, without privilege to do so, shall knowingly do any of the following:

2

> (1) Discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual[.]

O.R.C. 2909.01 defines "occupied structure" as follows:

> (C) "Occupied structure" means any house, building, outbuilding, watercraft, aircraft, railroad car, truck, trailer, tent, or other structure, vehicle, or shelter, or any portion thereof, to which any of the following applies:
>
> (1) It is maintained as a permanent or temporary dwelling, even though it is temporarily unoccupied and whether or not any person is actually present.
>
> (2) At the time, it is occupied as the permanent or temporary habitation of any person, whether or not any person is actually present.
>
> (3) At the time, it is specially adapted for the overnight accommodation of any person, whether or not any person is actually present.
>
> (4) At the time, any person is present or likely to be present in it.

Based upon the above, Ruvalcaba asserts that since the Ohio law does not require him to know that the structure is actually occupied, it does not qualify as an offense of violence. The Court disagrees.

In support of his argument, Ruvalcaba relies upon *U.S. v. Rice*, 520 F.3d 811, 820 (7th Cir. 2008). In *Rice,* the Seventh Circuit concluded that the defendant's crime constituted a crime of violence.

> In Rice's Illinois case, in contrast, the statute required proof that the defendant know or should reasonably know that another person occupied the vehicle. The charging document imposed an even higher standard, as it charged that Rice knew the vehicle was occupied. Discharging a firearm in the direction of another person or of a vehicle one reasonably should know to be occupied carries with it "a serious potential risk of physical injury to another" which is all that is required to constitute a crime of violence under § 4B1.2(a). *Cf. United States v. Hernandez-Rodriguez*, 467 F.3d 492, 495 (5th Cir. 2006).

*Id.* Ruvalcaba effectively argues that this Court should hold that the inverse of the *Rice* holding is

3

also true.  That is, Ruvalcaba seeks a ruling that since the Ohio statute does *not* require him to know whether the dwelling is occupied that it does not qualify as an offense of violence.  The Court cannot agree with this argument.

Upon review, each of the authorities that have reviewed statutes similar to the Ohio statute has reached the same conclusion.  The Ninth Circuit has addressed this issue in reviewing both California and Oregon law.  In *U.S. v. Weinert*, 1 F.3d 889 (9th Cir. 1993), the defendant's prior conviction mirrored the convictions herein.  Weinert was convicted of discharging a firearm at an inhabited building, and inhabited was defined as currently being used as a dwelling, "whether occupied or not."  *Id.* at 891.  Weinert argued "that a conviction under this statute can only qualify as a crime of violence when it is clear that the dwelling shot at was actually occupied."  *Id.*  In rejecting Weinert's argument, the Court noted as follows:

> The risk of physical injury exists in the very nature of shooting at an inhabited dwelling regardless of whether the residence was occupied at the time of the shooting. The act itself presents a risk to neighboring residents, bystanders and law enforcement authorities who may respond.

*Id.*  That Circuit reached a similar conclusion in evaluating an Oregon law that prohibited discharging a firearm in the direction of a building within the city limits.  *See U.S. v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004).  Like the Ohio statute, the Oregon statute had no requirement that the offender know that the building was inhabited.

> Oregon may properly concern itself with the risk of harm to persons who are within the city limits and near a building that is being fired upon. Such an act categorically "presents a serious potential risk of physical injury to another" and falls within the Guideline's definition of "crime of violence."  Whether or not people inhabited the building, a serious potential risk of physical injury resulted by the very nature of Terry-Crespo's act of firing his gun at a building located within Portland's city limits.

*Id.* at 1178-79; *see also U.S. v. Rabb*, 248 Fed. Appx. 133, 134-35 (finding that the violation of an Alabama unlawful discharge statute was a crime of violence despite the fact that it made "*no distinction between occupied and unoccupied dwelling[.]*").

Finally, even the Circuit relied upon by Ruvalcaba has acknowledge the inherent risk of discharging a firearm.

> As the district court concluded here, discharging a firearm is an inherently risky act. Even though shots were not aimed at a particular person, the actions of the mob could easily have caused an injury; the case law is replete with examples of bystanders being hurt by ricocheting bullets.
>
> …
>
> Because of the inherent risks associated with firearms, courts have concluded that firing-or in some cases even pointing-a firearm constitutes a crime of violence. *See United States v. Chapple*, 942 F.2d 439, 441 (7th Cir. 1991); *United States v. McNeal*, 900 F.2d 119, 121 (7th Cir. 1990); s*ee also United States v. Rutledge*, 33 F.3d 671, 674 (6th Cir. 1994) (firing gun in direction of coworker, even though in jest, constituted crime of violence because it placed coworker in imminent danger of serious injury); *United States v. Thompson*, 891 F.2d 507, 510 (4th Cir. 1989) (pointing firearm at another person constituted crime of violence because risk of physical force was "invariably present").

*U.S. v. Cole*, 298 F.3d 659, 662 (7th Cir. 2002).   The Court is persuaded by the rationale in the above cases.

The Ohio statute at issue likewise does not differentiate between an inhabited and uninhabited dwelling.  The Court, however, agrees with the above authorities.  It is the very act of discharging a firearm in the direction of a residence that creates a serious risk of physical harm. The presence of an individual may enhance that risk, but such presence is not a prerequisite to the existence of the harm.   Stray bullets take the lives of innocent bystanders on a much too frequent basis.  Furthermore, bullets pass through windows and walls and often end up a great distance

from where they were intended. Accordingly, the Court finds that the Report properly concluded that Ruvalcaba is a career offender.

Finally, the Court rejects the argument put forth in Ruvalcaba's supplemental sentencing memorandum. In that document, Ruvalcaba relies heavily on *U.S. v. Bartee*, 529 F.3d 357 (6th Cir. 2008). The *Bartee* Court noted as follows:

> Adhering to our view that the parallel provisions in the definitions of a "violent felony" under the ACCA and a "crime of violence" under USSG § 4B1.2(a)(2) should be interpreted in a consistent manner, we conclude that § 4B1.2(a)(2) also should be limited to crimes that are similar in both kind and in degree of risk to the enumerated examples - burglary of a dwelling, arson, extortion, or crimes involving the use of explosives. … [T]his interpretation narrows the scope of convictions that qualify as a "crime of violence" under § 4B1.2(a)(2), making it more difficult for the government to invoke the enhancement[.]

*Id.* at 363. Based upon *Bartee* and the Supreme Court cases that prompted it, Ruvalcaba asserts that since his act was committed knowingly and not purposely, this Court should not consider it a crime of violence. With respect to this argument, the Court finds *U.S. v. LaCasse,* Case No. 06-2212 (6th Cir. June 4, 2009) persuasive.

In *LaCasse*, the Sixth Circuit noted as follows:

> How closely does Michigan's "fleeing and eluding" statute resemble driving under the influence? Both require the offender to be driving a motor vehicle. Both undeniably involve "conduct that presents a serious potential risk of physical injury to another." If anything, driving under the influence may pose a greater potential risk of physical injury. Despite these similarities, the offenses contain critical differences, at least as viewed through the lens of *Begay*. First, fleeing and eluding is distinguishable with respect to intent: the offender makes a conscious decision to flee rather than to stop his vehicle as requested by a police officer. Unlike driving under the influence, this is not a strict liability or status crime that "need not be purposeful or deliberate." *Id.* at 1587. Moreover, fleeing and eluding involves aggressive conduct; the offender is attempting to outrun a police cruiser either in a low speed-limit area or in a manner that results in a collision or an accident. Mich. Comp.Laws § 750.479a(3).

6

The *LaCasse* Court went on to note that the fleeing and alluding statute at issue involved "'aggressive' conduct that 'presents a serious potential risk of physical injury' to another."

The Court finds the rationale expressed in *LaCasse* to be persuasive. Unlike the DUI offense found not to qualify as a violent offense in *U.S. v. Begay*, 128 S.Ct. 1581 (2008), Ruvalcaba's firearm offenses are not status offenses or strict liability offenses. Rather, Ruvalcaba could only be convicted upon a finding that he acted "knowingly." Under Ohio law,

> A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

O.R.C. § 2901.22(B). Thus, to be convicted, Ruvalcaba had to be aware that his conduct would probably cause a certain result, i.e., that the gun would fire and that a bullet would enter the residence. That fact takes Ruvalcaba's offense outside the realm of the offense labeled non-violent in *Begay*.

Furthermore, there is no doubt on the fact of the Ohio statute that it entails aggressive conduct. It penalizes firing a gun into a residence. The Court can think of no more apt description of that conduct than "aggressive." Accordingly, the Court reaches a conclusion consistent with that reached in *LaCasse*. Ruvalcaba's conviction is based upon aggressive behavior that posed a serious risk of physical harm to another. The career offender enhancement, therefore, is appropriate.

**IV. Departure and Variance**

Initially, the Court notes that the plea agreement in this matter contains a provision prohibiting Ruvalcaba from requesting a downward departure or variance. However, given the

unique circumstances of this matter, the Court previously ordered during an in-chambers conference that Ruvalcaba would be permitted to argue for both a departure and a variance.[1]

### A. Departure

There are no grounds for a downward departure. Ruvalcaba has suggested that a departure is warranted because his Criminal History category over-represents the seriousness of prior offenses. The Court cannot agree.

In support of the request for a departure, Ruvalcaba relies upon the fact that he was addicted to drugs and alcohol during the time frame in which his most significant convictions occurred. Such an addiction does not excuse Ruvalcaba's conduct.

First, Ruvalcaba's violent convictions bear no apparent relationship to his addiction. Both of those convictions resulted from firing a gun into a residence. There is no evidence to suggest that Ruvalcaba's addictions played any role in those offenses. For that matter, the second offense occurred three months after Ruvalcaba had served two years in prison. It is difficult for the Court to conceive of how Ruvalcaba's addictions not only returned in that three-month period, but also contributed to this second offense. Instead, Ruvalcaba's prior offenses demonstrate a history of violent and reckless behavior. Given that Ruvalcaba's 2002 firearm discharge conviction was accompanied with possession of more than 200 grams of marijuana, the Court is more inclined to believe that the shooting was an act of intimidation, than a result of some uncontrolled addiction.

Ruvalcaba also alleges that his offenses were committed close in time and therefore

---

1 During the sentencing hearing in this matter, the Court was unclear on what had transpired during that hearing. A subsequent review of the Court's internal documentation verified defense counsel's assertion that the Court had previously permitted her to make arguments for a variance and departure and that the Government had acquiesced in her ability to do so.

8

over-represent his criminal past.  Ruvalcaba is correct that he committed offenses rather quickly when he was not incarcerated.  However, his offenses are spread over numerous years because of the time he spent in prison.  That time in prison apparently did nothing to deter Ruvalcaba from committing future crimes.

Based upon all of the facts presented to the Court, the request for a departure is denied. The Court finds that Ruvalcaba's Criminal History category is an accurate representation of his prior offenses.

### B. Variance

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in exercising its judgment to determine an appropriate sentence and must offer a reasoned explanation for the sentence.  Based upon those factors, the Court finds that no downward variance is appropriate under the facts presented in this matter.

Initially, the Court acknowledges its discretion to vary based upon a disagreement with the policy espoused in the career offender enhancement.  The Court declines to vary on that basis.

In reaching its conclusion, the Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant.  The Court must also review the need for the sentence imposed: a) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; b) to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the Defendant; and c) to provide the Defendant with needed educational or vocational training, medical care, and/or other correctional treatment in the most effective manner.

1. <u>Nature and Circumstances of the Offense</u>

With respect to the sole count in the indictment to which Ruvalcaba has pleaded guilty, the Court details the nature and circumstances of the offense. Ruvalcaba, along with Carlos Tejada, Jose Corniel, Liset Reyes, and others, conspired to possess with the intent to distribute cocaine. More specifically, from January to August of 2008, Ruvalcaba supplied or assisted in supplying Tejada with slightly more than 600 grams of cocaine. In February 2008, Tejada twice sold quantities of the cocaine in Ohio, totaling 2.5 ounces. In May and June of 2008, Tejada and Ruvalcaba sold 1.5 kilograms of cocaine to undercover agents. On June 16, 2008, following the sale of one kilogram of cocaine, Ruvalcaba was in possession of $6,500 in cash paid by undercover agents for the cocaine. On July 11, 2008, Ruvalcaba stated that he was waiting for the two undercover officers to come over and try to collect money from him and that he was "ready to blow up any son of a bitch" that tried to do so. Ruvalcaba continued to discuss the sale of cocaine through August of 2008. These facts form the basis of the offense for which Ruvalcaba was charged.

The Court finds nothing extraordinary about the conduct forming the offense at issue. That is not to minimize the horrible effects on the community and others that result from drug trafficking. Ruvalcaba's conduct, however, does little if anything to set him apart from others convicted of similar offenses.

2. History and Characteristics of the Defendant

A bulk of Ruvalcaba's sentencing memorandum focuses upon his history and characteristics. The Court has carefully reviewed all of these characteristics in reaching its decision in this matter.

Ruvalcaba is 29 years old and is the third oldest of six children. Ruvalcaba's father

abused his mother for years as a result of alcoholism. Ruvalcaba's father also repeatedly beat one of his brothers with an extension cord. Ruvalcaba's mother failed to take advantage of the opportunities of social service agencies because of her extremely limited grasp of the English language. Furthermore, the Court is convinced that Ruvalcaba's mother was undoubtedly reluctant to seek assistance because her cultural background discouraged women from breaking away from family.

Additionally, the Court has little doubt that Ruvalcaba's troubled family life contributed to the fact that he began drinking and using drugs at the age of 14. Due to these actions, Ruvalcaba's mother kicked him out of the house at the age of 15. Around that time, Ruvalcaba appears to have survived by selling drugs. At the age of 16, Ruvalcaba periodically returned home to live with his parents. During one such visit, he passed out from drug use. He woke with restraints on his legs, placed there by his parents. At the time, they forced him to live with his aunt in Mexico. That living arrangement, however, lasted only three to four months.

Ruvalcaba also became a father for the first time at 15 and dropped out of high school in the ninth grade. Thereafter, Ruvalcaba has never held a steady job. Now at the age of 29, Ruvalcaba has four children. As his counsel stated:

> Jamie believes, by virtue of this case, that he has truly been given an opportunity to learn from his mistakes and to get "clean" and receive the treatment and counseling he needs to recover from his drug and alcohol dependency. He longs to be a better son to his parents and better father to his four young children.

Ruvalcaba has also expressed a desire to obtain his GED and has openly encouraged his younger siblings to complete their educations.

At first glance, Ruvalcaba seems a prime candidate to receive a lesser sentence and

11

effectively received a second chance at contributing to society and his family. Ruvalcaba attempts to paint himself as an individual that has learned his lesson and finally set himself straight. Sadly, however, Ruvalcaba is not an individual seeking a second chance. Instead, he is seeking a fifth or sixth chance.

As early as age 16, Ruvalcaba became involved with the legal system. At 18, he was arrested and convicted of DUI. At 21, Ruvalcaba was convicted of domestic violence. At 22, Ruvalcaba, on separate dates, was convicted of DUI and improperly discharging a firearm at a residence. Again at 24, Ruvalcaba was convicted of improperly discharging a firearm into a home. The Court notes that Ruvalcaba was released from prison for his first improper discharge conviction on April 14, 2004, after serving two years in prison. A little over three months after his release from prison, while still on supervised release, Ruvalcaba engaged in the actions that led to his second improper discharge conviction. Ruvalcaba was released from prison for that conviction in July of 2007. By January of 2008, less than six months later and while on supervised release, Ruvalcaba became involved in the instant drug conspiracy.

If Ruvalcaba's history is any indication, he does not take advantage of second chances. Instead, he routinely continues his criminal activity. Furthermore, the Court has examined the facts surrounding Ruvalcaba's more recent convictions.[2] With respect to the 2002 conviction, at least one of the passengers in the vehicle that fired shots at the residence stated that he "was going to kill" someone. It is clear from the police report that the suspect making this statement was Ruvalcaba. The report also makes it clear that persons were either in the residence in the very

---

2 Defense counsel is correct that the Court cannot consider these facts in determining whether Ruvalcaba is a career offender. The Court did not consider these facts in reaching that determination. These facts, however, are relevant to Ruvalcaba's history and characteristics.

near vicinity when shots were fired at the residence. Similarly, with respect to the 2004 conviction, witnesses were close enough to the shooting to witness Ruvalcaba firing into the residence.

Most troublesome to the Court is that Ruvalcaba seems to have learned nothing from his prior prison sentences. Ruvalcaba now appears before this Court, asserting that this is the wakeup call that he needed and that he is ready to turn his life around. The Court is unclear what to make of these assertions. Ruvalcaba had at least one child during both his 2002 and 2004 convictions. Despite that fact, he committed felonies. Moreover, Ruvalcaba spent roughly five years in prison as a result of those convictions, two years for the 2002 conviction and three years total for the 2004 conviction. After the first two years, Ruvalcaba committed a crime less than four months after his release. After the additional three years in prison, Ruvalcaba became involved in this conspiracy less than six months after his release.

Accordingly, in his past, Ruvalcaba has rather recklessly discharged a firearm into a residence on two separate occasions. Rather than learn from his mistakes, Ruvalcaba seems intent on making new, distinct mistakes. This time, Ruvalcaba aided in placing more than 600 grams of cocaine onto local streets.

The Court is not inclined to give Ruvalcaba yet another chance to damage society. In reaching this conclusion, the Court is mindful of the effect it will have on Ruvalcaba's family. Four children will be without their father for an extended period of time. Parents will be without their son for that same period. The Court, however, finds that a sentence of 188 months is sufficient, but not greater than necessary, to fulfill the goals of sentencing.

In reaching this conclusion, the Court finds that Ruvalcaba's upbringing is indeed a

mitigating factor. There is little question that his broken home and abusive father contributed to his childhood. Those facts, however, do not give Ruvalcaba free rein to ignore the law. Moreover, they did not excuse his repeated violations of the law. As such, the Court finds that a sentence of 188 months is appropriate.

3. Other Issues

The Court finds no merit in Ruvalcaba's argument surrounding his prior representation by Attorney Frank Pignatelli. In support of this argument, Ruvalcaba cites to a media article that indicates that Pignatelli was working with federal authorities. There are numerous flaws in this argument. First, the article itself indicates that Pignatelli began working with authorities in 2006, well after any representation of Ruvalcaba. Furthermore, there is nothing to suggest that Pignatelli did not provide proper counsel to Ruvalcaba. For that matter, Ruvalcaba received minimal sentences on his prior state convincing, evidencing that he received more than adequate representation from Pignatelli. Accordingly, the Court finds no basis for varying based upon this argument from Ruvalcaba.

In conclusion, the Court notes that if Ruvalcaba had not been labeled a career offender, the Court would have varied upward to reach a sentence of 188 months. As detailed above, Ruvalcaba has a significant criminal history that involved the dangerous discharge of firearms into residences. Furthermore, his past state imposed prison sentences have done nothing to deter him from future criminal activity. As such, the Court would have imposed a 188 month sentence even in the absence of a finding that Ruvalcaba was a career offender.

**V. Kinds of Sentences Available**

The final calculated advisory guideline range of imprisonment is 188-235 months. The

maximum statutory penalty is 40 years imprisonment, a $2,000,000 fine, and 5 years of supervised release.

**VI. Sentencing Disparities**

When imposing sentence in the matter, the Court was cognizant of the co-defendants. However, as detailed above, Ruvalcaba presents a unique scenario for sentencing. His career offender status, family history, and criminal history all set him apart from his co-defendants. Accordingly, the Court finds that any disparity presented between this sentence and that of the co-defendants is warranted by the unique facts herein.

**VII. Conclusion**

Based upon the above reasoning, pursuant to the Sentencing Reform Act of 1984 and 18 U.S.C. § 3553(a), it is the judgment of the Court that the Defendant Jaime Ruvalcaba is hereby committed to the Bureau of Prisons for a term of 188 months.

The Court finds that Ruvalcaba does not have the ability to pay a fine and therefore waives the imposition of any fine. Ruvalcaba must pay to the United States a special assessment of $100, which shall be due immediately. Following his release, Ruvalcaba will be subject to four years of supervised release with the conditions set forth on the record.

IT IS SO ORDERED.

June 18, 2009            */s/John R. Adams*
Date            JOHN R. ADAMS
           UNITED STATES DISTRICT JUDGE